IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

JOE COX, on behalf of himself
and a class of similarly situated persons,

                Plaintiff,

v.                                    CIVIL ACTION NO. 3:24-0033

CONSUMERINFO.COM, INC.,
d/b/a Experian,
EXPERIAN INFORMATION SOLUTIONS, INC.,
d/b/a Experian,

                Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending is Defendants' Motion to Compel Arbitration. ECF No. 11. Inasmuch as the Plaintiff has presented a genuine of material fact regarding mutual assent, the Defendants' Motion is **DENIED WITHOUT PREJUDICE.**

**I. Background**

Plaintiff filed a putative class action lawsuit in this Court on January 16, 2024, claiming that Defendants ConsumerInfo.com, Inc. and Experian Information Systems (hereinafter "Defendants" or "Experian") are liable for unjust enrichment, violations of the Fair Credit Reporting Act, "unconscionable contract" and "unconscionable delegation clause," and joint venture. *See* Compl., ECF No. 1.

Plaintiff's claims arise from his usage of the Defendants' website www.FreeCreditReport.com. Federal law requires credit reporting agencies to provide every customer with a free credit report yearly and to create a website by which consumers can request

their free reports. *Id.* at ¶¶ 23–24.

The mandated website is www.annualcreditreport.com. *Id.* at ¶ 25. Plaintiff argues that the Defendants created the website www.FreeCreditReport.com and "marketed it in a way that distracted from the actual free credit report site mandated by the statute and found a way to charge consumers for this 'free' product." *Id.* at ¶ 26.

Plaintiff's Complaint alleges that when a consumer accesses the www.FreeCreditReport.com website, she is greeted by the following:



*Id.* at ¶ 16. As seen above, before even scrolling down the page, the consumer is met with five (5) separate representations that the Experian Credit Report is available for "free."

When a consumer clicks on the "Get your Free Credit Report and FICO® Score" button, she is redirected to another page where she is prompted to provide the last four digits of her social security number and her phone number before clicking a button to create an account. *Id.* at ¶ 19. According to Plaintiff's Complaint, the "Get started" button is the following text:

> By clicking "Get started": I accept and agree to the Terms of Use Agreement as well as acknowledge receipt of your Privacy Policy. I consent to Experian sending a one-time verification text to the phone number provided. Message and data rates may apply.
>
> **Get started**

*Id.* The phrases "Terms of Use Agreement" and "Privacy Policy" are in blue, unbolded, hyperlinked text. *Id.*

Defendants' Director of Operations, Dan Smith's affidavit submits that a different webform existed on the day Plaintiff created his account:

> By clicking "Create Your Account": I accept and agree to your Terms of Use Agreement, as well as acknowledge receipt of your Privacy Policy.
>
> I authorize ConsumerInfo.com, Inc., also referred to as Experian Consumer Services ("ECS"), to obtain my credit report and/or credit score(s), on a recurring basis to:
>
> - Provide my credit report (and/or credit score) to me for review while I have an account with ECS.
> - Notify me of other products and services that may be available to me through ECS or through unaffiliated third parties.
> - Notify me of credit opportunities and advertised credit offers.
>
> I understand that I may withdraw this authorization at any time by contacting ECS.
>
> **Create Your Account**

Smith Aff. ¶ 3. In this screen capture, the font is bold and provides some examples of what the Defendants will do with the consumer's credit report or score.

In both instances, if the consumer clicks on the "Terms of Use Agreement" hyperlink, she is led to lengthy contract which, among other things, (1) gives Experian the right to sell the consumer's financial information to private parties; (2) requires the consumer to arbitrate any claims; and (3) waives the consumer's right to obtain damages if the Defendant makes mistakes in

the credit reporting process. *See Id.* at ¶¶ 33–34.

A consumer is not required to scroll through, or even click on the hyperlinked agreement. *Id.* at ¶ 30. Similarly, consumers are not required to "check a box that indicates the consumer has read the Terms of Use Agreement." *Id.* at ¶ 31.

In response to Plaintiff's suit, Defendants have moved the Court to compel arbitration based on the expansive arbitration agreement contained within the Terms of Use Agreement. *See* Defs.' Mot., ECF No. 11.

Plaintiff has testified that there was no meeting of the minds between him and Experian, and that he "was simply trying to sign up for a free – truly FREE – credit report service, to which [he] is entitled under federal law." Cox Aff. ¶¶ 3(b)–4, ECF No. 23. He further testified that if he "had been informed by Defendants that the service was not actually 'free' and instead that it required [him] to give away important privacy and legal rights, [he] would not have entered into the agreement. *Id.* at ¶ 3(a).

## II. Legal Standard

Section 2 of the Federal Arbitration Act ("FAA") provides that an arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract[.]" 9 U.S.C. § 2. If one party to a written arbitration agreement refuses to arbitrate, Section 4 authorizes another party to file a petition in a district court for an order directing that arbitration proceed under the agreement.[1] To compel arbitration, a movant must show:

---

[1]In relevant part, Section 4 provides:

> [a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under title 28, in a

> "(1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the defendant to arbitrate the dispute."

*Adkins v. Lab. Ready, Inc.*, 303 F.3d 496, 500–01 (4th Cir. 2002) (quoting *Whiteside v. Teltech Corp.*, 940 F.2d 99, 102 (4th Cir. 1991)). If the court finds that an arbitration agreement is valid and governs the issues presented, the court "has no choice but to grant a motion to compel[.]" *Id.* at 500 (citing *United States v. Bankers Ins. Co.*, 245 F.3d 315, 319 (4th Cir. 2001)).

However, "[u]nder the FAA, 'the party seeking a jury trial must make an unequivocal denial that an arbitration agreement exists,'" and "'show genuine issues of material fact regarding the existence of an agreement to arbitrate.'" *Galloway v. Santander Consumer USA, Inc.*, 819 F.3d 79, 85 (4th Cir. 2016) (quoting *Chorley Enterprises, Inc. v. Dickey's Barbecue Restaurants, Inc.*, 807 F. 3d 553, 564 (4th Cir. 2015)).

Accordingly, "the applicable standard of review is akin to the burden on summary judgment." *Gooch v. Cebridge Acquisition LLC*, No. 2:22-CV-00184, 2023 WL 415984, at *3 (S.D.W. Va. Jan. 25, 2023) (quoting *Galloway*, 819 F.3d at 85 n.3) (internal quotation marks omitted). "Specifically, the pleadings and all relevant, admissible evidence submitted by the parties are considered and all reasonable inferences are drawn in favor of the non-moving party." *Id. (*quoting *Barach v. Sinclair Media III, Inc.*, 392 F. Supp. 3d 645, 650 (S.D.W. Va. 2019) (internal quotations and citations omitted)).

---

civil action . . . of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement.

9 U.S.C. § 4, in part. In this case, the Court has federal question jurisdiction over Plaintiff's Complaint.

### III. Analysis

**A. The Question of Whether Plaintiff Agreed to the Contract Containing the Arbitration Agreement Is One to Be Answered by the Court.**

As a threshold matter, Defendants argue that because the Arbitration Agreement "delegates 'all issues' to an arbitrator, including all questions regarding arbitrability, enforceability and scope, and whether the contract is unconscionable, void or voidable," Plaintiff's claims must be sent to an arbitrator. *See* Defs.' Mem. at 4, 12–13.

While parties are free to agree to arbitrate arbitrability, *see First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995), "when the parties disagree as to whether an agreement to arbitrate has been formed, 'the dispute is generally for the courts to decide,'" *Rowland v. Sandy Morris Fin. & Estate Planning Servs., LLC*, 993 F.3d 253, 258 (4th Cir. 2021) (quoting *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296 (2010)).

Accordingly, because Plaintiff plainly asserts that there was a lack of mutual assent to the overarching contract that contains the arbitration agreement, *see, e.g.*, Compl. ¶ 78, Pls.' Resp., ECF No. 17, analysis of the mutual assent issue is squarely within this Court's purview.

**B. An Issue of Material Fact Remains Regarding Plaintiff's Assent to the Terms of Use Agreement.**

"Questions concerning the validity, effect, and interpretation of a contract are resolved according to the law of the state where the contract was made." *Seabulk Offshore, Ltd. v. Am. Home Assurance Co.*, 377 F.3d 408, 419 (4th Cir. 2004) (citing *Woodson v. Celina Mut. Ins. Co.*, 211 Va. 423, 426 (1970)).

In West Virginia, as in other states, "[t]he elements of a contract are an offer and an acceptance supported by consideration." *Elk River Pipeline LLC v. Equitable Gathering LLC*, No. 2:10-cv-01080, 2013 WL 164151, at *9 (S.D.W. Va. Jan. 15, 2013) (citations omitted); *State ex rel. AMFM, LLC v. King*, 740 S.E.2d 66, 73 (W. Va. 2013) ("[T]he fundamentals of a legal

contract are competent parties, legal subject matter, valuable consideration and mutual assent."). "There can be no contract if there is one of these essential elements upon which the minds of the parties are not in agreement." *King*, 740 S.E.2d at 73 (quoting *Virginian Exp. Coal Co. v. Rowland Land Co.* 131 S.E. 253, 254 (W. Va. 1926)). Here, it is the Defendant's burden to "establish[] the existence of a binding contract to arbitrate the dispute." *Rowland*, 993 F.3d at 258 (alteration in original).

Defendants argue that because West Virginia's courts have recognized the validity of "clickwrap" contracts, Plaintiff unequivocally assented to the Defendants' Terms of Use when he clicked the enrollment button. *See* Defs.' Mem. at 11 (citing *Lutz v. Turner Broadcast Sys., Inc.*, 187 F. Supp. 3d 706, 713 (N.D.W. Va. 2016); *State ex rel. U-Haul Co. of W. Va. v. Zakaib*, 752 S.E.2d 586 (W. Va. 2013)); Smith Aff. at ¶ 5, ECF No. 11-2.

Yet, the cases Defendants cite do not stand for the proposition that all clickwrap agreements are necessarily valid. *See Lutz*, 187 F. Supp. 3d at 713 (holding only that "West Virginia law upholds the use of 'clickwrap' or 'click-through' agreements, which require users to consent to any terms and conditions through the use of internet web-pages"); *Zakaib*, 752 S.E.2d at 594–95 (simply holding that electronic contracts are not less valid than paper agreements).

Here, the Court finds a question of material fact remains regarding Plaintiff's assent to the Terms of Use. This finding is supported by number of facts. *First*, Plaintiff attests that when he created his account, he "was simply trying to sign up for a free – truly FREE – credit report service, to which [he] is entitled under federal law." Cox Aff. ¶ 4. In as much as it is not disputed that Experian is required by federal law to provide consumers with free credit reports yearly, *see* 15 U.S.C. §1681j(a), drawing all inferences in favor of the non-movant, it is reasonable to conclude that Plaintiff was merely creating an account in order to access a credit report that he was

entitled to for free and did not appreciate that he was entering into an agreement that would give the Defendants a right to sell his personal information.

Indeed, the repeated use of the word "free" on the Defendants' webpage would likely not put a consumer like Plaintiff on notice that agreeing to the terms of creating an account would come with significant strings attached.

*Second*, considering the evidence in the light most favorable to the Plaintiff, the Court cannot conclude that the Plaintiff had "clear notice of the Terms of Use at the time he enrolled." *See* Defs.' Mem. at 11. Defendants' website does not require consumers to scroll through, or even click on, the Terms of Use before accepting them. *See Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1033 (7th Cir. 2016) ("Nowhere did this button require him first to click on the scroll box or to scroll down to view its complete contents, nor did it in any other way call his attention to any arbitration agreement."). Additionally, the version of the sign-up page provided by the Plaintiff does not contain any bold lettering or capital letters that would necessarily draw the consumer to the terms of use. *See* Compl. ¶ 19; *Rowland*, 993 F.3d at 257 (noting that Courts are to "accept as true the allegations of the … Complaint that relate to the underlying dispute between the parties") (internal quotation marks omitted).

*Third*, the enrollment page does little more to place a consumer on notice that the consumer must provide something in exchange for her "free credit report." Despite Defendants' argument that Plaintiff "was admonished that, by clicking an adjacent button, he was agreeing to be bound to the Terms of Use," Defs.' Mem. 11, courts have noted that a website's prompt to read hyperlinked terms can be obfuscated when the language surrounding the link does not summarize the agreement or may otherwise distract the consumer, *see, e.g.*, *Austin v. Equifax Info. Servs., LLC*, No. 3:22CV707, 2023 WL 8646275, at *9 (E.D. Va. Dec. 14, 2023); *Sgouros*, 817 F.3d at

1035. Here, both the sign-up screens presented by the Plaintiff and the Defendants mention multiple agreements.

> Plaintiff's version of the screen includes four (4) separate acknowledgements:
>
> "By clicking "Get started": **[1]** I accept and agree to the Terms of Use Agreement as well as **[2]** acknowledge receipt of your Privacy Policy. **[3]** I consent to Experian sending a one-time verification text to the phone number provided. **[4]** Message and data rates may apply."

Compl. ¶ 19 (emphasis and numbering added). Similarly, the Defendants' version notes that in addition to accepting the Terms of Use Agreement and acknowledging receipt of the Privacy Policy, it authorizes ConsumerInfo.com to obtain the consumer's credit report and/or credit score so that Defendants can provide the consumer with credit reports, notify the consumer of products and services that may be available, and to notify the consumer of credit opportunities.[2] In fact, the Court is of the opinion that the sign up page provided by the Defendants is even more likely to "distract[] the [consumer] from the service agreement by informing him that clicking served a particular purpose unrelated to the agreement." *Sgouros*, 817 F.3d at 1036.

*Fourth*, even if Cox had clicked on the hyperlinked terms, they were "laden with legal jargon" and "accessed through a system that does not clearly explain what is actually happening." *Austin*, 2023 WL 8646275, at *7.

Ultimately, "the Court has a duty to be sure that [the consumer] was clearly informed of that to which he is claimed to have agreed and to be sure that his agreement was not procured by deceit. Where, as here, the undisputed record is that [the plaintiff] thought he was applying for a

---

[2] Notably none of these authorizations mention the Defendants giving third parties access to a consumers' personal financial information or the consumer's relinquishment of her right to a jury trial.

free credit report but, instead, was actually put in a position of supposedly agreeing to arbitration, the process that produced that result must be examined carefully." *Id.*

Consequently, upon examination of that process, the Court is unable to find, as a matter of law, that the Plaintiff assented to the agreement. "Section 4 of the FAA requires the court to conduct a trial of the issue if there are 'sufficient facts' support[ing] a party's denial of an agreement to arbitrate." *Rowland*, 993 F.3d at 258 (internal quotation marks omitted). In light of the Court's gatekeeping role, the Court finds it must allow discovery on contract formation and make further findings of fact on the contract formation issue.

### IV. Conclusion

In sum, the Defendants' Motion to Compel Arbitration is **DENIED WITHOUT PREJUDICE.**[3] The Court will enter a separate Order and Notice.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER:   August 1, 2024

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE

---

[3] The Court notes that because it finds a genuine issue of material fact as to whether an agreement between the parties exists, it declines to opine on whether the arbitration clause contained therein is unconscionable.